UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEROY MOORE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EQUITY RESIDENTIAL MANAGEMENT, L.L.C.,<br><br>Defendant. | Case No. 16-cv-07204-JCS<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 106, 107 |

## I.      INTRODUCTION

Plaintiffs Leroy Moore, Dominika Bednarska, Perlita Payne, and Brett Estes are or were residents of an apartment complex operated by Defendant Equity Residential Management, L.L.C. ("Equity").  All Plaintiffs except for Payne are disabled and require the use of an elevator to access their apartments; Payne is married to and lives with Bednarska.  Following an extended elevator outage in November of 2015 that limited Plaintiffs' abilities to access or leave their apartments, Plaintiffs brought this action under state, local, and federal law.  The parties have filed cross motions for summary judgment, and the Court held a hearing on November 1, 2019.  For the reasons discussed below, Equity's motion is GRANTED as to Plaintiffs' claims under the Rehabilitation Act of 1973 and California's Unruh Civil Rights Act (the "Unruh Act"), as well as Plaintiffs' claims based on inaccessible doors other than the elevator.  The motions are otherwise DENIED, although the Court narrows certain aspects of the remaining claims as discussed below.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.    BACKGROUND

### A.    Factual Background

Equity operates the Acton Courtyard apartment complex in Berkeley, California. On November 13, 2015, the only elevator in the building ceased to operate due to a failed circuit board. ThyssenKrupp, the company with which Equity contracted to maintain the elevator, told Equity that the circuit board was obsolete and could not be replaced, and that the only option was to send the circuit board to New Jersey for repairs. Although Equity paid extra costs to expedite repairs, the process of repairing the circuit board took many days, and the first attempt at a repair was unsuccessful, requiring the circuit board to be sent back to New Jersey for further work before the elevator could be returned to service on November 27, 2015—fifteen days later, and after the Thanksgiving holiday.

ThyssenKrupp's advice to Equity that the circuit board was obsolete and could not have been replaced turned out to be incorrect. After the elevator returned to service, Equity investigated the issue and determined that replacement circuit boards were available for purchase. When the circuit board failed again in 2018, Equity was able to obtain a replacement and return the elevator to service within twenty-four hours. There is no evidence, however, that Equity knew at the time of the 2015 outage that replacement circuit boards were available, or that Equity's efforts to have the circuit board repaired were deficient in way except for the choice to attempt to repair rather than replace it.

Plaintiffs were residents of the Acton Courtyard at the time of the 2015 outage. Plaintiff Estes, who is quadriplegic and was in his apartment when the outage began, was unable to leave his apartment for the duration of the outage. Plaintiff Moore, who has cerebral palsy, was similarly confined to his apartment for much of the outage, but needed to travel for work twice during that period and thus was required to slowly and painfully navigate the stairs on those occasions. Plaintiff Bednarska, who primarily used an electric scooter for mobility, was outside of her apartment when the outage began and not able to return for the duration of the outage. She and her wife, Plaintiff Payne, were forced to stay in hotels until the elevator returned to service. Plaintiffs brought this action asserting claims primarily based on the 2015 elevator outage.

United States District Court
Northern District of California

**B.   Procedural History**

This case was initially assigned to the Honorable Maria-Elena James, who resolved three motions to dismiss.

On March 7, 2017, the Court granted in large part Equity's motion to dismiss Plaintiffs' original complaint. *See* Order Re: Mot. to Dismiss ("Mar. 2017 Order," dkt. 23).[2]   That order was based primarily on a lack of factual allegations rather disputed issues of law, and the Court granted Plaintiffs leave to amend. *Id.*

On June 21, 2017, the Court granted in part a motion to dismiss Plaintiffs' first amended complaint. *See* Order Re: Mot. to Dismiss Am. Compl. ("June 2017 Order," dkt. 35).[3]   The Court dismissed Plaintiffs' failure-to-accommodate claims under the Rehabilitation Act, the Fair Housing Act ("FHA"), California's Fair Employment and Housing Act ("FEHA"), and the California Disabled Persons Act ("CDPA") with leave to amend for failure to allege sufficiently that Plaintiffs each requested specific accommodations that were denied, and dismissed a failure-to-accommodate claim under the Unruh Act with prejudice, because "this is not an available basis for relief under the Unruh Act." *Id.* at 4–6.   Equity also argued that Plaintiffs' Unruh Act and CDPA claims must be dismissed because those does not apply to private residential complexes, citing *Coronado v. Cobblestone Village Community Rentals*, 163 Cal. App. 4th 831 (2008), but the Court rejected that reading of *Coronado*, holding instead that the California appellate court relied on provisions of other laws (like the Americans with Disabilities Act ("ADA")) underlying the *Coronado* plaintiffs' Unruh Act and CDPA claims that only applied to public accommodations, not that the Unruh Act or CDPA themselves contained such a requirement. *Id.* at 8–11, 12.   The Court dismissed Plaintiffs' claims under the Berkeley Municipal Code for failure to allege that the building contained more than ten units, and for failure to include sufficient allegations of untimely repair or failure to provide alternative housing. *Id.* at 13–14.   The Court declined to dismiss

---

[2] *Moore v. Equity Residential Mgmt., L.L.C.*, No. 16-cv-07204-MEJ, 2017 WL 897391 (N.D. Cal. Mar. 7, 2017).  All citations to particular pages in the Court's previous orders refer to the versions of the orders filed in the Court's ECF docket.

[3] *Moore v. Equity Residential Mgmt., L.L.C.*, No. 16-cv-07204-MEJ, 2017 WL 2670257 (N.D. Cal. June 21, 2017).

Payne's claims for lack of standing, except for her claim for damages under the CDPA, which the Court dismissed with leave to amend if Payne elected to pursue injunctive relief rather than damages under that statute, and her claim under the Berkeley Municipal Code. *Id.* at 6–8, 14. The Court also dismissed claims unrelated to elevator access. *Id.* at 12.

On December 4, 2017, the Court granted in part and denied in part Equity's motion to dismiss Plaintiffs' operative second amended complaint. *See generally* Order Re: Mot. to Dismiss ("Dec. 2017 Order," dkt. 44).[4]  The Court held that Plaintiffs' allegations that they requested reasonable accommodations under the Rehabilitation Act, the FHA, FEHA, and the CDPA were sufficient, although Plaintiffs' allegations of theories under the FHA other than failure-to-accommodate were conclusory and subject to dismissal. *Id.* at 7, 9. The Court also held that Plaintiffs had sufficiently alleged a violation of the Rehabilitation Act based on deliberate indifference to Plaintiffs' known disabilities and need for elevator access. *Id.* at 8–9. The Court declined to dismiss Plaintiffs' Unruh Act, CDPA, and FEHA claims based on California Building Code violations related to the elevator. *Id.* at 9–10. The Court allowed the CDPA and FEHA claims to proceed based also on a theory that Bednarska, Moore, and then-plaintiff Annamarie Hara encountered excessively heavy doors, but dismissed claims based on other purported access barriers, and dismissed the Unruh Act claim based on heavy doors for failure to allege willfulness. *Id.* at 10–11. The Court declined to dismiss Plaintiffs' claims for damages under Berkeley Municipal Code sections 19.50.030 and 19.50.40(A)–(B) (and, with respect to Bednarska, section 19.50.40(C)) but dismissed Payne's Municipal Code claims for lack of standing and dismissed all plaintiffs' claims for injunctive relief under the Municipal Code. *Id.* at 11–13.

The December 2017 order summarized the remaining claims as follows, dismissing all other claims without further leave to amend:

> (1) All Plaintiffs have stated failure to accommodate claims in connection with the November 2015 elevator outage, and to that extent have stated claims under the Rehabilitation Act, FHA, FEHA, and CDPA;

---

[4] *Moore v. Equity Residential Mgmt., L.L.C.*, No. 16-cv-07204-MEJ, 2017 WL 5992129 (N.D. Cal. Dec. 4, 2017).

4

(2) All Plaintiffs have stated claims under the Rehabilitation Act, FEHA, CDPA, and Unruh Act based on elevator outages;

(3) Bednarska, Moore and Hara also have stated claims under FEHA and the CDPA based on encountering excessively heavy doors; and,

(4) Bednarska, Moore, Estes and Hara have stated claims under the Berkeley Municipal Code.

*Id.* at 13–14.

The case was reassigned to the undersigned magistrate judge by stipulation of the parties in February of 2018 after Judge James retired from the Court. *See* dkts. 53–55. Former plaintiff Annamarie Hara settled and dismissed her claims against Equity in January of 2019. *See* dkts. 90, 91.

## C. Present Motions

Plaintiffs move for partial summary judgment on Moore, Bednarska, and Estes's claims under the Berkeley Municipal Code, Pls.' Mot. (dkt. 107) at 7–14, on Moore, Bednarska, and Estes's claims under the CPDA based on building code requirements, *id.* at 14–18, and, for the purpose of Plaintiffs' Rehabilitation Act claim, on the issues of whether Equity receives federal financial assistance and whether Plaintiffs are "otherwise qualified" to participate, *id.* at 18–23. Plaintiffs reserve all issues of damages for trial.

Equity purports to move for summary judgment on all of Plaintiffs' claims, although its motion does not address Plaintiffs' discrimination or accessibility (as opposed to accommodation) theory under FEHA or the CDPA. Equity seeks summary judgment on Plaintiffs' discrimination claims for failure to meet the intent requirements of the Unruh Act and the Rehabilitation Act, *id.* at 17–18, and separately seeks summary judgment as to the Rehabilitation Act on the basis that Equity does not receive federal financial assistance, *id.* at 18–19. According to Equity, Plaintiffs' reasonable accommodation claims under all of the statutes at issue fail because Moore and Estes did not request accommodations and because Bednarska and Payne's requests either were granted or were not for reasonable accommodations. Def.'s Mot. (dkt. 106) at 12–17. Equity contends that it is entitled to judgment on Plaintiffs' claim for excessively heavy doors because Plaintiffs' own expert found that the doors met applicable standards for force required to open them. *Id.* at 19–20. Finally, Equity argues that its offer to provide, or actual provision of, alternative housing

during the outage entitles Equity to judgment on Plaintiffs' claims under the Berkeley Municipal Code.

### III.     ANALYSIS

#### A.     Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id*. (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id*.; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

(2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). The Court therefore draws all reasonable inferences in favor of Equity for the purpose of Plaintiffs' motion, and all reasonable inferences in favor of Plaintiffs for the purpose of Equity's motion.

### B. Rehabilitation Act Requirements

A plaintiff bringing a claim under section 504 of the Rehabilitation Act "must show that (1) she is handicapped within the meaning of the [Act]; (2) she is otherwise qualified for the benefit or services sought; (3) she was denied the benefit or services solely by reason of her handicap; and (4) the program providing the benefit or services receives federal financial assistance." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). A plaintiff seeking damages under this statute also "must prove a *mens rea* of 'intentional discrimination,' to prevail on a section 504 claim, but that that standard may be met by showing 'deliberate indifference,' and not only by showing 'discriminatory animus.'" *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138–39 (9th Cir. 2001)).

The elements specific to the Rehabilitation Act disputed in the parties' present motions are whether Equity received federal financial assistance for the apartment complex where Plaintiffs lived and whether Equity displayed deliberate indifference in failing to ensure elevator service. Each party seeks summary judgment in its favor on the former issue; only Equity seeks summary judgment on the latter. Because Plaintiffs have not offered evidence from which a reasonable jury could conclude that Equity received federal financial assistance, the Court need not reach the question of whether Plaintiffs could show deliberate indifference for the purpose of this statute. The Court also does not reach Plaintiffs' argument for summary judgment that they were "otherwise qualified" for the service provided, which Equity does not address in its opposition brief.

The parties dispute whether or what sort of federal funding or other federal incentives Equity has received with respect to the apartment complex at issue. It is difficult to understand why the parties were not able to resolve this issue conclusively through discovery. Nevertheless,

7

the record is sufficient to grant Equity's motion as to this issue, because Plaintiffs have not met their burden to show that Equity receives federal financial assistance within the meaning of the Rehabilitation Act.

Plaintiffs argue that Equity receives federal assistance in the form of Low Income Housing Tax Credits ("LIHTCs"). The Department of Housing and Urban Development considers LIHTCs to be financial assistance for the purpose of the Rehabilitation Act, and at least one district court has so held, without analysis. *Hill v. Hampstead Lester Morton Court Partners, LP*, No. CIV. CCB-12-539, 2013 WL 1314393, at *3 (D. Md. Mar. 28, 2013), *vacated in part on other grounds*, 581 F. App'x 178 (4th Cir. 2014); Dep't of Housing & Urban Dev., FAQ ID 2645, https://www.hudexchange.info/faqs/2645/how-do-the-section-504-requirements-impact-a-development-which-is-not/ (Oct. 2015); *but see West v. Palo Alto Hous. Corp.*, No. 17-cv-00238-LHK, 2019 WL 2549218, at *23 (N.D. Cal. June 20, 2019) ("In the analogous Rehabilitation Act context, courts have uniformly determined that tax credits do not constitute financial assistance." (citing decisions considering tax credits other than LIHTCs)), *appeal docketed*, No. 19-16458 (9th Cir.).

Plaintiffs also cite a decision from the Northern District of Oklahoma as holding that LIHTCs constitute financial assistance under the Rehabilitation Act, but that case in fact held that the defendant did not receive LIHTCs, without addressing whether receipt of LIHTCs would bring the defendant within the scope of the Rehabilitation Act. *See Shaw v. Cherokee Meadows, LP*, No. 17-CV-610-GKF-JFJ, 2018 WL 2770200, at *2 (N.D. Okla. June 8, 2018) ("The Complaint includes no allegations that Blackledge applied for or received Low Income Housing Tax Credits. Thus, receipt of Low Income Housing Tax Credits cannot provide the basis of plaintiffs' Rehabilitation Act claim."). Like in *Shaw*, the clearer issue here is not whether receipt of LIHTCs bring an organization within the scope of the Rehabilitation Act, but instead whether Plaintiffs have shown that Equity received LIHTCs for the apartment complex at issue.

Plaintiffs rely on the deposition testimony of Nessa Sinclair, whom Equity designated as its person most knowledgeable on the subject. In the discussion of the LIHTC program, both Plaintiffs' counsel and Sinclair conflated that program with a tax-exempt bond financing program,

8

and counsel referenced a lease addendum stating that the premises "(i) were financed with proceeds from the sale of tax-exempt multifamily housing revenue bonds under Section 142 of the Internal Revenue Service (IRS) code *and/or* (ii) is administered under the Low Income Housing Tax Credit program under section 42 of the IRS code." *See* Derby Decl. (dkt. 142) Ex. J (Sinclair Dep.) at EQR.MOORE0000635 (Lease Addendum). The relevant testimony was as follows:

> Q. . . . Have you ever heard of the low-income housing tax credit program?
>
> A. Yes.
>
> Q. Okay. What is that to your knowledge?
>
> A. To my knowledge, that is – it's one of the -- so, so you know, I don't deal specifically with the affordable housing component at my community, so I know that *that's one of the bond programs* that we have at -- for Acton Courtyard, but I don't really know beyond that.
>
> Q. Okay. But *it's a bond program* that Equity participates in for Acton; is that correct?
>
> A. Correct.

*Id.* at 293:5–20 (emphasis added).

> Q. Okay. And this is a lease for Brett Estes for -- it appears to be 2015 to 2016; is that correct?
>
> A. Yes.
>
> Q. Okay. And if I direct your attention to the addendum at 635, which is the -- entitled the "Affordability Compliance Addendum Tax Exempt Bond/Tax Credit."
>
> A. Uh-hm.
>
> Q. So is this the addendum that refers to the fact that Equity participates in the low-income housing tax credit program for Acton?
>
> A. Yes.

*Id.* at 294:4–16.

> Q. Okay. Is it possible that other than the resident manager's unit [all of the units in the building] participate in the low-income housing tax credit program?
>
> . . .
>
> THE WITNESS: No, I do not believe they do.

. . .

Q. Okay. And so would there be -- I guess, as counsel implied, the way to find out would be to look at each lease and see?

A. Correct. I would have to look at each apartment number to see what the designation is on that.

Q. Okay. And to your knowledge, if we find it in one year's lease -- like in Brett Estes' lease for 2015 and 2016, would we then find it in all the leases for that unit over time?

A. That should be the case, yes.

Q. Okay. Because it -- it flows with the unit, not with the person?

A. Correct.

Q. Okay. And that's a program that's -- that Equity is still participating in to this day?

A. Yes.

*Id.* at 297:17–298:15.

The beginning of this line of questioning demonstrates at least some degree of confusion as to the topic at issue. Contrary to both Sinclair's answer and counsel's subsequent question, LIHTCs are not a bond program. *See id.* at 293:5–20; *see also* Winn Opp'n Decl. (dkt. 110-1) Ex. B (Sinclair Dep.) at 300:23–25 ("Q. Okay. How about the low-income housing tax credit/bond program; is there any way for you to know that it's not on this 142?"). The ambiguity created by that apparent misunderstanding is clarified by Sinclair's other testimony and her subsequent declaration. Sinclair testified earlier in her deposition that Equity "do[es] not accept any federal funding," and that in her role as general manager for properties including Acton Courtyard, she is aware of all sources of income and programs in which the property participates, none of which are federally funded. Winn Opp'n Decl. Ex. B (Sinclair Dep.) at 285:19–20, 286:23–287:5. In her declaration, Sinclair states that the lease addendum is included because the property participates in a tax-exempt bond financing program, not because it receives LIHTCs, and explains her deposition testimony as follows:

8. During my deposition, one of plaintiff's [sic] attorneys asked me what the low-income housing tax credit program was. I believed she was referring to the tax exempt *bond* program at Acton Courtyard (i.e., the Regulatory Agreement). (See Deposition Page 293:11-17.) The attorney's response seemed to confirm that when she referenced

10

> "the low income housing tax credit program," she was actually referring to the Regulatory Agreement (i.e., the tax exempt bond program) because she stated that "it [the low-income housing tax credit program] is a bond program that Equity participates in for Acton." (See Deposition Page 293:18-20.)
>
> 9. I understand that plaintiffs' attorneys are now arguing that Acton Courtyard participates in a federal low income housing tax credit program and receives financial aid. That is not true. As I said in my deposition, Acton Courtyard does "not accept any federal funding." (See 285:19-20.) This is still true today.

Sinclair Opp'n Decl. (dkt. 110-3) ¶¶ 8–9.

Plaintiffs offer no evidence other than Sinclair's deposition testimony suggesting that Equity receives LIHTCs for the property at issue. In light of the clear confusion at the deposition and Sinclair's unambiguous statement in her declaration that Equity benefits only from tax-exempt bonds, not LIHTCs, no reasonable jury could find on this record that Equity receives LIHTCs. Plaintiffs have not argued that the tax-exempt bond program is sufficient to bring Equity within the scope of the Rehabilitation Act. Plaintiffs have not met their burden to show that Equity receives federal financial assistance within the meaning of the Rehabilitation Act. Plaintiffs' motion is therefore DENIED as to that issue, and Equity's motion is GRANTED as to Plaintiffs' Rehabilitation Act claim.

## C. Discrimination Claims (FEHA, CDPA, and Unruh Act)

In the order on the motion to dismiss Plaintiffs' second amended complaint, the Court allowed Plaintiffs to proceed on discrimination theories under the Unruh Act, the CDPA, and FEHA based on failure to provide elevator access as required by the California Building Code. Dec. 2017 Order at 9–10. Equity's present motion for summary judgment on Plaintiffs' discrimination claims addresses only the intent requirements of the Rehabilitation Act and the Unruh Act. Def.'s Mot. at 17–18. Because Equity has not presented any basis for summary judgment on Plaintiffs' CDPA or FEHA claims based on the California Building Code, those claims may proceed.[5] Plaintiffs seek summary judgment on their claim under the CDPA, although

---

[5] The CDPA has no intent requirement. *Donald v. Cafe Royale, Inc.*, 218 Cal. App. 3d 168, 176–81 (1990). The parties have not addressed the intent required to support a claim for housing discrimination based on disability under FEHA. FEHA does not require a showing of animus or ill will for disability discrimination. *See Wallace v. County of Stanislaus*, 245 Cal. App. 4th 109,

11

they reserve all questions of damages or other remedies for trial.  Pls.' Mot. at 14–18.  As discussed below, Equity's motion is GRANTED as to the Unruh Act claim, and Plaintiffs' motion is DENIED as to their CDPA claim.

### 1. Equity's Motion as to the Unruh Act

A plaintiff bringing a claim under the Unruh Act generally "must 'plead and prove intentional discrimination in public accommodations in violation of the terms of the Act.'" *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (quoting *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 668 (2009)).  "[A] plaintiff must therefore allege, and show, more than the disparate impact of a facially neutral policy." *Id.*  In rejecting a disparate impact test under the Unruh Act, the California Supreme Court has held that the language of the statute and its treble damages provision "imply willful, affirmative misconduct on the part of those who violate the Act." *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 853 (2005) (quoting *Harris v. Capital Growth Inv'rs XIV*, 52 Cal. 3d 1142, 1172 (1991)).  The Ninth Circuit has held that this requirement of "'willful, *affirmative* misconduct'" prohibits use of a deliberate indifference standard.  *Greater L.A.*, 742 F.3d at 427 (quoting *Koebke*, 36 Cal. 4th at 853) (emphasis added in *Greater L.A.*).

Although the California Supreme Court recognizes an exception to the requirement of discriminatory intent where an Unruh Act claim is based on a purported violation of the ADA, *Munson*, 46 Cal. 4th at 664, Plaintiffs cannot rely on that exception here because their ADA claim was dismissed, *see* Mar. 2017 Order at 4–6, and Plaintiffs did not renew that claim in their operative second amended complaint, *see generally* 2d Am. Compl. (dkt. 36, "SAC").

Plaintiffs rely on cases holding that a discriminatory business practice short of total exclusion can suffice, *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1145–46 (2018), that evidence of disparate impact can in some cases be probative of intent, *Koebke*, 36 Cal. 4th at 854, and that operating "from a motive of rational self-interest" is not a defense under the statute,

---

128 (2016) (considering an employment discrimination claim).  The Court declines to address sua sponte whether the evidence in this case could satisfy any other degree of intent that might be required under that statute.

United States District Court
Northern District of California

*Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721, 740 n.9 (1982).[6] Pls.' Opp'n (dkt. 111) at 16.  As Plaintiffs themselves acknowledge, however, their Unruh Act claim is based on the following purported deficiencies in Equity's elevator maintenance and response to the outage:

> (1) Failing to maintain and repair an elevator or keep doors in compliance, in a building designed for and marketed to people with disabilities; and (2) Denying disabled tenants' reasonable accommodations requests outright or "granting" them but then gratuitously undermining the accommodation, *e.g.*, moving Plaintiffs to an inaccessible hotel or not paying the hotel bill. These are not merely "impacts", but business decisions taken intentionally by Defendant for a building it operates for disabled persons (receiving federal subsidies for doing so).

*Id.* at 17.  Plaintiffs cite no case holding that a defendant's similar *failure to act* to maintain a service or provide accommodation can satisfy the Unruh Act's requirement of "'willful, *affirmative* misconduct.'"  *See Greater L.A.*, 742 F.3d at 427 (quoting *Koebke*, 36 Cal. 4th at 853). Equity's motion is GRANTED as to Plaintiffs' Unruh Act claims.

### 2.  Plaintiffs' Motion as to the CDPA

Plaintiffs bring their CDPA claim under section 54.1(b)(1) of the California Civil Code, which provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to all housing accommodations offered for rent, lease, or compensation in this state, subject to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons."  Cal. Civ. Code § 54.1(b)(1).  Plaintiffs do not rely on section 54.1(a), which applies only to places of public accommodation.  As Equity notes in its opposition brief, section 54.1(b) "does not require a person renting, leasing, or providing for compensation real property to modify his or her property in any way or provide a higher degree of care for an individual with a disability than for an individual who is not disabled."  Cal. Civ. Code § 54.1(b)(4).  Equity contends that Plaintiffs cannot prevail on this claim because section 54.1(a) does not apply to private residential areas (rather than public

---

[6] In *Marina Point*, the California Supreme Court stated as an example of this principle that a "an entrepreneur may find it economically advantageous to exclude all homosexuals, or alternatively all nonhomosexuals, from his restaurant or hotel, but such a 'rational' economic motive would not, of course, validate the practice."  30 Cal. 3d at 740 n.9.  That example concerns an affirmatively exclusionary policy.  The California Supreme Court did not suggest that mere inaction out of self-interest is sufficient.

accommodations) and section 54.1(b) does not require modifications for or special treatment of individuals with disabilities.  Def.'s Opp'n (dkt. 110) at 18–21.  Plaintiffs argue that a violation of any other law governing building or access standards can support a claim under section 54.1(b), and that Equity violated the California Building Code by failing to maintain its elevator sufficiently.

In effect, Equity asks the Court to reconsider its previous holding regarding Plaintiffs' ability to bring a claim under the CDPA based on violations of California building standards.  The Court considered that issue on Equity's second motion to dismiss, and addressed it as follows, first in the context of the Unruh Act,[7] and then incorporating that analysis for the purpose of the CDPA:

> . . . Defendant once more moves to dismiss Plaintiff's [sic] Unruh Act claim on the ground that the Unruh Act does not apply to residential housing complexes. *See* Mot. at 12. Plaintiffs argue the Court's reasoning in dismissing the original Unruh Act claim is no longer applicable now that they no longer premise the claim on a violation of the ADA. *See* Opp'n at 16-19.
>
> In *Coronado v. Cobblestone Village Community Rentals*, 163 Cal. App. 4th 831, 840-41 (2008), overruled on other grounds, *Munson*, 46 Cal. 4th at 678, the wheelchair-bound plaintiff alleged the owners of his apartment complex violated the Unruh Act by failing to provide an access ramp that would allow the plaintiff to get down from the curb into the parking area. *Id.* at 838. The plaintiff asserted defendants had promised to install a concrete wheelchair ramp and that he had offered to pay for the ramp, but defendants never installed the ramp. One day, while trying to navigate the curb, the plaintiff's wheelchair tipped over and injured both him and his wife. *Id.* at 837. The plaintiff contended "that the existence of the particular structural barrier (i.e., lack of a curb ramp) on the pathway outside the apartment denied his right to full and equal access to public accommodation." *Id.* at 840. The trial court sua sponte refused to send the Unruh Act claim to the jury because, although the partnership that owned the complex was a business, and the partnership's office in the complex was a public accommodation, the private apartments and the area where the plaintiff was injured were not public accommodations within the meaning of Unruh. *Id.* at 838 (the fact that leasing office was a public accommodation "did not convert the entirety of the apartment complex—including residential areas—into public accommodation for purposes of the relevant statutes"). The California Court of Appeal found that the Unruh Act "is fully applicable to defendants' apartment

---

[7] Although the Court now grants summary judgment for Equity on Plaintiffs' Unruh Act claim for the separate reason of failure to establish affirmative misconduct, the previous analysis of the Unruh Act is relevant to the previous holding regarding the CDPA.

complex business" in general, and proceeded to evaluate whether the plaintiff could establish Section 51 had been violated based on the evidence presented at trial. *See id.* at 841 (quoting *Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721, 731 (1982)). The plaintiff argued the defendants had violated Section 51 because California Government Code section 4450, California Health and Safety Code section 19955, and the ADA required the defendants to install the wheelchair ramp as a modification. *Id.* at 841.

The California Court of Appeal thus analyzed whether these statutes imposed such a duty on the owner of the apartment complex, and concluded they did not, because each statute applied only to places of public accommodation. See *id.* at 845-50. The Court of Appeal did not hold the Unruh Act was inapplicable to residential apartment complexes; rather, it held that the "other provisions of law" the plaintiff relied upon to establish the defendants had violated Section 51(b) did not apply to that residential apartment complex because it was not a place of public accommodation as defined by those statutes. *See id.* at 851 ("[A] plaintiff seeking to establish a cause of action under the Unruh Civil Rights Act or the Disabled Persons Act based solely on the existence of a structural barrier must be able to show that the failure to remove the barrier constituted a violation of a structural access standard set forth in other provisions of law. In the instant case, none of the statutes that were referred to by plaintiff as the source of such structural access standards was applicable to the residential and common areas of the apartment complex."). Absent binding authority to the contrary, the Court finds the Coronado court's reasoning persuasive and follows it here.

To plead their Unruh Act claim, Plaintiffs also rely on the violations of other code provisions. *See* FAC ¶ 49 (relying on California Building Code provisions as well as other, unspecified provisions). Some of the violations Plaintiffs list in their attempt to state an Unruh Act claim are conclusory and do not state a claim. *See* FAC ¶ 49(a)-(b). But with respect to the specific California Building Code provisions they allege, Plaintiffs do state a claim. *See id.* ¶ 49(c)-(e). Each of these provisions pertains to elevator access as the sole means of egress of the Property from their dwelling units. Defendant does not argue that the specific provisions Plaintiffs identify do not apply to residential apartment complexes. *See* Mot. Defendant does not analyze whether the Building Code provisions identified by Plaintiffs support the Section 51(b) claim (*see* Mot. at 12; Reply at 7-8), and the Court therefore cannot find Plaintiffs fail to state an Unruh Act claim on this ground. The Motion to Dismiss the Unruh Act claim is DENIED to the extent the claim is premised on specific violations of the Building Code pertaining to elevator access and egress from the Property; it is GRANTED to the extent the claim is premised on failure to accommodate or unspecified "failure and refusal to construct and/or alter the Property's facilities in compliance with state building code and state architectural requirements" (FAC ¶ 49(b))

June 2017 Order at 9–11 (second paragraph break added; footnotes omitted).

Defendant argues the CDPA only permits Plaintiffs to pursue an accessibility claim against places of public accommodations. Mot. at 11. The Court rejects that argument for the same reasons it rejects

United States District Court
Northern District of California

> Defendant's argument Plaintiffs cannot, as a matter of law, state an Unruh Act violation based on a barrier to access in a residential apartment complex. *See Coronado*, 163 Cal. App. 4th at 845 (concluding that to state an CDPA claim based on structural or architectural barrier, "the existence of the barrier must violate a separate provision of law relating to structural access standards," and that the separate provisions of law were not implicated because the apartment complex was not a place of public accommodation).

*Id.* at 12.

Plaintiffs argue that the prior decision is law of the case and should not be disturbed. Pls.' Reply at 5–6. But courts "have discretion to reopen a previously resolved question" under certain circumstances, including where "the first decision was clearly erroneous." *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993). Although the Court concludes that the reasoning of the previous order did not address all relevant considerations, the Court stands by the conclusion that a violation of generally-applicable provisions of the California Building Code can support a claim under section 54.1(b).

The prior analysis focused on the Unruh Act rather than the CDPA. The Unruh Act includes a provision similar to the section 54.1(b)(4)'s disclaimer of any requirement to modify property, but with a significant difference. Under the Unruh Act, no alteration is required "beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law." Cal. Civ. Code § 51(d). The CDPA includes no similar express acknowledgment of alterations otherwise required by law. *See* Cal. Civ. Code § 54.1(b)(4).

The section of *Coronado* on which this Court's prior order relied opened with a discussion of the law's application to public accommodations. *See Coronado*, 163 Cal. App. 4th at 844 ("Historically, sections 54 and 54.1 have been construed to mean that 'all physically handicapped are entitled to the same right as the able-bodied to full and free use of *public* facilities and places,' requiring operators of such public facilities and accommodations to 'open [their] doors on an equal basis to all that can avail themselves of the facilities without violation of other valid laws and regulations.'" (emphasis added; citations omitted)). The *Coronado* court went on to discuss a court that interpreted those statutes *as applied to public accommodations*—or in other words, section 54.1(a) rather than section 54.1(b)—as not in themselves requiring modifications to buildings. *See id.* (discussing *Marsh v. Edwards Theatres Circuit, Inc.*, 64 Cal. App. 3d 881, 890–

16

92 (1976)).  As noted in *Marsh*, the provision of the CDPA providing for a private action for an injunction specifically authorizes such actions for violations of two statutes governing access standards; both of those laws only apply to public accommodations.  *See Marsh*, 64 Cal. App. 3d at 891–92; Cal. Civ. Code § 55 (referencing Cal. Gov't Code § 4450 *et seq.*; Cal. Health & Safety Code § 19955 *et seq.*); *see also People ex rel. Deukmejian v. CHE, Inc.*, 150 Cal. App. 3d 123, 133 (1983) (stating that the laws referenced by section 55 were enacted to "give meaning to the public accommodation law prohibiting discrimination against the handicapped").  The *Coronado* decision went on to consider only whether those two statutes supported the plaintiff's claim, and held that they did not, because the statutes only applied to public accommodations and the barrier that the plaintiff encountered was in a private residential area.  *Coronado*, 163 Cal. App. 4th at 845–47.  *Coronado* did not address whether a violation of the California Building Code in a non-public area can support a claim under section 54.1(b).  Accordingly, it is not obvious from that decision that Plaintiffs' theory of the case is viable.

The Court nevertheless concludes that section 54.1(b), by its own terms, supports Plaintiffs' claims.  That statute provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to all housing accommodations."  Cal. Civ. Code § 54.1(b)(1).  By the statute's plain language, access must not only be "equal," it must also be "full."  *Id.*  There is no question that a person with a disability precluding the use of stairs lacks the same "full" access to an upper-floor apartment as other members of the general public if no functional elevator is available.

Section 54.1(b)(4) sets significant limitations on the general rule.  A building owner need not "modify his or her property in any way" to allow for such access.  Cal Civ. Code § 54.1(b)(4).  Accordingly, if a building does not have an elevator, section 54.1(b) would not require the owner to add one.  But Plaintiffs do not ask for such a modification here: the building had an elevator, and they merely needed it to be maintained.  A building owner also need not "provide a higher degree of care for an individual with a disability than for an individual who is not disabled."  *Id.*  Accordingly, if the owner was not required to maintain the elevator in a particular manner for non-disabled tenants, section 54.1(b) would not require them to provide heightened maintenance on

behalf of disabled tenants. Here, however, Plaintiffs contend that Equity failed to meet generally applicable standards of the California Building Code. Equity would be bound by those standards regardless of whether the tenants at Acton Courtyard were disabled or non-disabled. Compliance with them therefore does not constitute "a higher degree of care for an individual with a disability," *cf. id.*, and the exception of section 54.1(b)(4) does not apply. In the absence of that exception, the general standard of section 54.1(b)(1) requires Equity to provide disabled tenants with "full and equal access" to all housing accommodations, which it did not do when the elevator was out of service.

The provision of the Building Code on which Plaintiffs rely are section 1102A.2, which requires elevators to be maintained in compliance with accessibility standards, and section 1124A.1,[8] which defines whether an elevator is "maintained" for the purpose of the Building Code. *See* Pls.' Mot. at 16. Section 1124A.1 provides that elevators "shall comply with this chapter, ASME A17.1, . . . and any other applicable safety regulations of other administrative authorities having jurisdiction." Plaintiffs contend that Equity failed to conduct "inspections, examinations, and tests at required or scheduled intervals" as required by ASME A17.1 and failed to comply with inspections ordered by the California Division of Occupational Safety and Health ("Cal-OSHA"). Pls.' Mot. at 16–18.[9]

---

[8] Equity faults Plaintiffs for failing to cite section 1124A.1 in their complaint. Def.'s Opp'n at 21–22. Plaintiffs' theory that Equity failed to maintain its elevator has been central to this case from the outset, and a plaintiff need not state legal theories with particularity under federal pleading standards. *Johnson v. City of Shelby*, 574 U.S. 10 (2014). Regardless, Plaintiffs' complaint specifically asserts that Equity violated the CDPA by failing to comply with "'ASME' Standard A17.1 as mandated by [California Building Code] section 1116B.1 *et seq.*" SAC ¶ 46(b). That citation encompasses section 1124A.1, which comes after section 1116B.1 and specifically references ASME A17.1 Equity also contends that the Building Code only applies at the time of construction, but fails to square that argument with provisions of the building code, like those at issue here, requiring "maintenance." *See* Def.'s Opp'n at 22.

[9] Plaintiffs also argue briefly that this section of the Building Code incorporates the sections of the Berkeley Municipal Code on which they base their claim, but Plaintiffs have not shown that Berkeley's requirement to return an elevator to service within twenty-four hours is a "safety regulation." Although the Court suggested at the hearing that a violation of the Berkeley Municipal Code might in itself constitute a violation of CDPA in at least some circumstances, without need for incorporation through the Building Code, the Court agrees with Equity that Plaintiffs' complaint, which sets forth other particular statutory violations as the grounds for Plaintiffs' CDPA claim without reference to the Berkeley Municipal Code, did not put Equity on notice of such a theory. *See* SAC ¶ 45.

In light of evidence that ThyssenKrupp did not conduct monthly service calls as required under its contract with Equity, *see* Stabler Decl. (dkt. 109) ¶¶ 12–21, a jury could determine that Equity failed to conduct tests at "scheduled intervals" as required by ASME A17.1.  A jury might also credit Plaintiffs' expert's opinion that Equity failed to comply with Cal-OSHA regulations, although Defendant's expert's opinion that the Cal-OSHA orders at issue were "routine in nature, and do not reflect any specific problems with the elevator or the door operator board," Greene Opp'n Decl. (dkt. 110-4) ¶ 16, is sufficient to deny Plaintiffs' motion for summary judgment based on the Cal-OSHA orders.  Even assuming for the sake of argument that Equity's failure to conduct regular inspections is undisputed—Equity asserts that it is "hotly contested," but cites no evidence to the contrary, Def.'s Opp'n at 23—Equity's expert states in his declaration that the November 2015 outage was not preventable through such inspections because the circuit board did not require regular maintenance, circuit board failures are unpredictable, the circuit board was only halfway through its expected useful life, and no function of the "Otis Service Tool" that Plaintiffs' expert faults ThyssenKrupp for not using could have predicted the circuit board failure.  Greene Decl. (dkt. 106-4) ¶ 8; Greene Opp'n Decl. ¶¶ 8, 12, 18.

Although both parties vigorously dispute the opposing expert's conclusions, neither party has moved to exclude the opinions of the opposing expert under the standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or any other evidentiary doctrine.  Accordingly, although Plaintiffs' theory that Equity violated section 54.1(b) by failing to meet Building Code elevator maintenance standards is viable, Plaintiffs are not entitled to summary judgment on this claim because a jury could credit Equity's expert's conclusions either that Equity did not violate those standards or that any such violation was unrelated to the outage that limited Plaintiffs' access to or from their apartments.  Plaintiffs' motion is DENIED as to this claim.

### D.    Failure to Accommodate (FHA, FEHA, and CDPA)

Equity seeks summary judgment on Plaintiffs Estes and Moore's claims for failure to provide a reasonable accommodation on the grounds that neither Moore nor Estes requested an accommodation.  Def.'s Mot. (dkt. 106) at 13–14.  In considering Equity's motions to dismiss, the Court previously held that Plaintiffs each must have affirmatively requested a reasonable

19

accommodation in order to proceed on a claim for failure to provide such accommodations. *See, e.g.*, Mar. 2017 Order at 7–8 (relying on federal enforcement agency guidance); June 2017 Order at 4–6. Because a reasonable jury could find that each plaintiff did so, the Court need not reconsider that holding and assumes for the purpose this order that an affirmative request is a necessary element of such a claim.

The Court notes, however, that Equity cites no binding Ninth Circuit or California appellate authority for such a rule in its briefs, relying instead on district court decisions or federal appellate decisions from other circuits. The Court further notes that neither the Judicial Council of California's model jury instruction for "Refusal to Make Reasonable Accommodation in Housing" (CACI 2548) nor the Ninth Circuit's statement of the elements of a failure-to-accommodate claim under the Fair Housing Amendments Act, *see Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003), specifically require an affirmative request for accommodation. At least in the context of employment law, some courts have held that a defendant's duty to provide a reasonable accommodation arises from the defendant's knowledge that an accommodation is necessary, without need for an affirmative request by the plaintiff. *See, e.g.*, *Robinson v. HD Supply, Inc.*, No. 2:12-CV-00604-GEB, 2012 WL 5386293, at *6 (E.D. Cal. Nov. 1, 2012) (citing *Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935, 950–51 (1997)). If this case proceeds to trial, the parties should be prepared to address in more detail whether Plaintiffs must prove that they affirmatively requested accommodation.

Equity also moves for summary judgment on Bednarska and Payne's reasonable accommodation claims on the grounds that their requests either were granted or were not requests for reasonable accommodations. The Court addresses each plaintiff's claims in turn below.

### 1. Estes

When asked at his deposition if he ever sought "any accommodation from Equity concerning the elevator," Estes responded, "No." Winn Decl. (dkt. 106-1) Ex. C (Estes Dep.) at 9:25–10:2. In his declaration, however, Estes states that, among other communications during the elevator outage, he told an Equity representative that he "wanted them to do everything in their power to repair the elevator immediately." Estes Decl. (dkt. 111-3) ¶ 2. He explains that

discrepancy by stating that he "thought [defense counsel] was referring to the offer to move into a hotel," which he had declined because he did not think it would be practical to move all of his adaptive equipment to a hotel room. *Id.* ¶ 4.

Equity argues that the Court should disregard Estes's declaration because it contradicts his deposition testimony, citing *Yeager v. Bowlin*, 693 F.3d 1076, 1079–80 (9th Cir. 2012). Def.'s Reply (dkt. 113) at 1. In *Yeager*, the Ninth Circuit explained the "sham affidavit" rule as follows:

> "'The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.'" *Van Asdale* [*v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)] (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). This sham affidavit rule prevents "a party who has been examined at length on deposition" from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony," which "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy*, 952 F.2d at 266 (internal quotation marks omitted); *see also Van Asdale*, 577 F.3d at 998 (stating that some form of the sham affidavit rule is necessary to maintain the principle that summary judgment is an integral part of the federal rules). But the sham affidavit rule "'should be applied with caution'" because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment. *Id.* (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993)), In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998–99.

*Yeager*, 693 F.3d at 1080. The Ninth Circuit went on to caution that the "'non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.'" *Id.* at 1081 (quoting *Van Asdale*, 577 F.3d at 999). On the facts of that case, the Ninth Circuit held that the district court did not abuse its discretion in disregarding a plaintiff's affidavit where the court "could reasonably conclude that no juror would believe [his] weak explanation for his sudden ability to remember the answers to important questions about the critical issues of his lawsuit." *Id.*

The difference between Estes's deposition testimony here and his subsequent declaration is not minor, and goes to a key element of his claims for failure to accommodate. The Court

nevertheless cannot say with confidence that no reasonable jury could credit Estes's explanation for the discrepancy. While Equity may offer Estes's deposition testimony for impeachment if it so chooses, the question of whether Estes requested that Equity "do everything in [its] power to repair the elevator immediately," Estes Decl. ¶ 2 is an issue of fact to be resolved by the jury at trial. The Court declines to grant Equity's motion on this basis.

Estes also testified at his deposition that he called the Equity office because he was upset that the elevator was not working and that no one had called him about it, and "wanted to know when it would be back working." McGuinness Decl. (dkt. 111-1) Ex. E (Estes Dep.) at 11:15–12:3. The Court need not reach the question of whether Estes expression of frustration with the outage and request for information could be construed as an implied request for accommodation.

Equity argues that Plaintiffs cannot proceed on a reasonable accommodation claim based on Equity's failure to repair the elevator more quickly because Equity was pursuing what it believed was the only option for repair, and there is no evidence that Equity had a policy of delaying elevator repairs. Def.'s Mot. at 15–16; Def.'s Reply at 5–6.[10] As Equity notes in its motion, an accommodation must be possible and must not impose undue financial or administrative burdens in order for failure to provide that accommodation to support a claim. *See Giebeler*, 343 F.3d at 1157; *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). In this case, there is evidence that (although it did not know it at the time) Equity could have simply ordered a replacement circuit board, *see* Stabler Decl. ¶ 28,[11] and Equity has not argued that doing so would have imposed an undue burden. Equity cites no authority for the proposition that a housing

---

[10] Equity also briefly argues that the request for immediate repair is not a request for a reasonable accommodation because "it does not seek an exception to any policy, practice, or procedure." Def.'s Mot. at 15. The FHA's reasonable accommodation provision requires a landlord "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Equity provided a "service" of repairing the elevator. A request to modify the manner in which Equity provided that service could be a request for reasonable accommodation.
[11] Equity asserts that "Plaintiffs have not provided any evidence showing that there was, in fact, another circuit board readily available in November 2015." Def.'s Reply at 6. Plaintiffs' expert Joseph Stabler states in his declaration that the "PC Board is and was in 2015 readily available for overnight shipping from the UNITEC warehouse." Stabler Decl. ¶ 28. No party has moved to exclude any opinions of an opposing expert witness. The Court therefore concludes that a jury could credit Stabler's opinion that the board was available.

provider's mistaken belief that accommodation is not possible is a defense.  The Court need not decide on this motion whether an accommodation might be unreasonable if a defendant would not reasonably have known that it was available—a question not clearly presented by either party.  Even if the Court so held, Equity's senior regional facilities manager Mark Tremain, who has no formal training in elevator repairs and no personal experience servicing elevators, was able to determine after service was restored that the circuit board was not obsolete and was instead available for replacement from a source in nearby San Jose, California.  *See* Tremain Opp'n Decl. (dkt. 110-2) ¶ 20; Derby Decl. Ex. G (Tremain Dep.) at 21:9–23.  A jury might conclude that Equity should reasonably have investigated whether the part was available during the fifteen-day elevator outage, and that conducting such an investigation and replacing the circuit board to return the elevator to service more quickly would have been a reasonable accommodation of Plaintiffs' disabilities.[12]

### 2. Moore

Defense counsel asked Moore at his deposition if he had "ever requested an accommodation from Equity," and Moore responded that he had only requested one accommodation, related to automatic withdrawal of rent from his bank account.  Winn Decl. Ex. B (Moore Dep.) at 12:25–13:5.  As there is no indication that the request for automatic withdrawal of rent was related to Moore's disability, it is not clear whether Moore understood defense counsel's question.  Moore also testified that he called the Equity office three times during the

---

[12] Plaintiffs briefly argue that Equity's duties were nondelegable, such that unreasonable actions by ThyssenKrupp can be imputed to Equity.  *See* Pls.' Mot. at 11; Pls.' Opp'n at 4; Pls.' Reply at 3.  The cases on which Equity relies are not on point.  In *Fair Housing Congress v. Weber*, the Central District of California held only that "a property owner is liable for the discriminatory acts of *employees* even if the property owner instructed his employees not to discriminate."  993 F. Supp. 1286, 1294 (C.D. Cal. 1997) (emphasis added) (citing *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 552 (9th Cir. 1997) (holding that racially "[d]iscriminatory conduct on the part of a rental agent is, however, attributable to the owner of a motel, apartment complex, or other public housing facility").  Regardless, the Supreme Court has rejected the Ninth Circuit's former rule that vicarious liability was available under the Fair Housing Act more broadly than under traditional principles of agency, *see generally Meyer v. Holey*, 537 U.S. 280 (2003), and Plaintiffs have not argued that ThyssenKrupp's relationship with Equity satisfies the traditional test of agency.  Plaintiffs also cite California cases discussing a nondelegable duty to maintain property *in a safe condition*, but have not argued or shown that the property at issue in this case was unsafe.  *See Brown v. George Pepperdine Found.*, 23 Cal. 2d 256, 260 (1943); *Koepnick v. Kashiwa Fudosan Am., Inc.*, 173 Cal. App. 4th 32, 36–37 (2009).

outage and left voicemail messages to notify Equity that the elevator was out of service and request information. *Id.* at 23:16–25:15. According to Moore, no one responded to his first two calls, but after the third call, an Equity representative called back and offered him a hotel room. *Id.* Moore declined that offer because it would have been too difficult to move everything he would need to live and work at another location. *Id.* at 25:19–24. In his declaration, Moore states that in one of his voice messages and in his conversation with an Equity representative, he informed Equity that he needed the elevator repaired immediately. Moore Decl. (dkt. 111-5) ¶¶ 2–3.

As with Estes, the Court declines to hold that Moore's new statement in his declaration is a sham. Although Moore testified that he did not request an accommodation other than automatic rent withdrawal, and did not mention at his deposition that he told Equity he needed the elevator repaired immediately, he was not asked whether he requested an immediate repair. The Court declines to disregard Moore's declaration and thus declines to grant Equity's motion on this basis.

Moore also states in his declaration that he requested that, "in the future, management should tell us immediately when there are outages." Moore Decl. ¶ 3. Equity contends that requesting such notice is not a request for an accommodation because it already had a policy and practice of notifying residents of elevator issues. Def.'s Mot. at 16–17 (citing, e.g., Sinclair Decl. (dkt. 106-3) ¶ 11. There is evidence from which a reasonable jury could determine that Equity's policy of providing updates was not honored consistently—or in other words, that while such notice might have been Equity's *policy*, it was not a consistent *practice*. *See, e.g.*, McGuinness Decl. Ex. E (Estes Dep.) at 12:1–6 (stating that Estes first learned of the November 2015 outage when his attendant, presumably not an Equity employee, told him that the elevator was not working). Moore also testified that he did not receive a call when the elevator went out of service in December of 2018, and only learned that it was out when he attempted to leave his apartment and saw a sign on the elevator. McGuinness Decl. Ex. D (Moore Dep.) at 44:3–10. A jury could determine from this evidence that Equity failed to act on the request to proactively notify tenants of elevator outages.

### 3. Bednarska and Payne

Bednarska and Payne contend that Equity failed to provide reasonable accommodations in that it did not immediately repair the elevator, did not provide acceptable substitute housing for much of the elevator outage, did not reimburse their costs for food while Bednarska could not access the apartment, and did not give them a rent credit. Equity seeks summary judgment that it granted Bednarska and Payne's request for a hotel, and that their remaining requests do not constitute reasonable accommodations.

#### a. Alternative Housing

Upon learning that the elevator was inoperable, Equity proactively contacted Bednarska and Payne by telephone and email to inform them of the outage and offer alternative housing at a hotel, which Bednarska and Payne accepted. Sinclair Decl. ¶¶ 17–19. When Bednarska and Payne arrived at the La Quinta hotel at Equity's direction, they found that the room reserved for them was not wheelchair accessible because the elevator at the hotel also was not working and the "plywood plank" that the hotel offered to place on the stairs would have been dangerous for Bednarska to attempt to use in her wheelchair. McGuinness Decl. Ex. B (Payne Dep.) at 24:3–11; *id.* Ex. C (Bednarska Dep.) at 23:1–18.[13] An employee at La Quinta referred Bednarska and Payne to a Holiday Inn Express, where they found an acceptable room. McGuinness Decl. Ex. C (Bednarska Dep.) at 24:8–25:3. Bednarska initially had to put the room on her credit card, but Equity ultimately paid for their stay. *Id.* at 24:13–16. Bednarska and Payne only stayed at the Holiday Inn Express for two or three days, because Equity (expecting the repairs to be completed sooner) did not authorize their stay for the full period of the elevator outage. *Id.* at 24:24–25:6; Sinclair Decl. ¶ 21. When Equity sought to extend the stay, the hotel was fully booked, and Bednarska and Payne had to relocate to the Berkeley Inn, which had a room that Bednarska could access but lacked a fully accessible shower that Bednarska could use independently without flooding the bathroom, and was otherwise unpleasant. Sinclair Decl. ¶¶ 21–22; McGuinness Decl.

---

[13] The parties offer competing hearsay statements as to whether Equity informed La Quinta that Bednarska and Payne needed a wheelchair accessible room. Equity offers Sinclair's statement as to what an unidentified Equity employee told La Quinta, while Plaintiffs offer their recollection of what an unidentified La Quinta employee told Bednarska and Payne. Neither is admissible.

Ex. C (Bednarska Dep.) at 25:4–27:9. Equity called ten hotels and Bednarska called "a couple other hotels," but neither Bednarska nor Equity was able to find another local hotel with an accessible room available. Sinclair Decl. ¶ 22; McGuinness Decl. Ex. C (Bednarska Dep.) at 27:17–21. Bednarska testified that the Holiday Inn became fully booked only after she requested that Equity extend their authorization. McGuinness Decl. Ex. C (Bednarska Dep.) at 25:4–19; *see generally* Sinclair Decl. Ex. D (email correspondence among Bednarska, Payne, and Equity employees regarding Bednarska and Payne's hotel stays and requests for other accommodations).

Plaintiffs cite no authority that a brief setback—like the La Quinta lacking accessibility before Bednarska and Payne found an acceptable room at the Holiday Inn Express later that day that Equity ultimately paid for—can support a claim for failure to provide a reasonable accommodation. Equity is also correct that Plaintiffs have not met their burden to show that any room more accessible than the one at the Berkeley Inn was available after Bednarska and Payne left the Holiday Inn Express. Nevertheless, Bednarska's testimony indicates that she and Payne would have been able to remain at the Holiday Inn Express if Equity had authorized a longer stay at the outset. McGuinness Decl. Ex. C (Bednarska Dep.) at 25:4–19. Whether it was reasonable for Equity to authorize only a short stay when Equity could not know with certainty when the elevator would return to service is a question for the jury. The Court declines to grant Equity's motion on the basis that it reasonably provided alternative accessible housing.

b. Other Accommodations

On November 20, 2015—the midpoint of the fifteen-day period when the elevator was out of service—Bednarska and Payne's attorneys sent Equity a letter requesting the following accommodations: (1) immediately repairing the elevator; (2) revising policies to ensure that the elevator remained in service going forward and that Equity better communicated with residents regarding elevator issues; (3) reimbursing hotel and meal expenses; and (4) providing a rent a utilities credit for days that Bednarska was unable to access her apartment. Sinclair Decl. Ex. E.[14]

---

[14] Because Estes and Moore's reasonable accommodation claims may proceed based on their declarations that they verbally requested accommodations, the Court need not reach Plaintiffs' argument that this letter was sent on behalf of all Plaintiffs, despite its failure to identify Estes or Moore by name.

Plaintiffs pursue each of those theories in their opposition brief except for the request to provide adequate maintenance going forward to ensure that the elevator remained in service. *See* Pls.' Opp'n at 20–25.

As discussed above in the context of Estes's claim, a jury could find that Equity's failure to repair the elevator more quickly by obtaining a replacement circuit board supports a claim for failure to provide a reasonable accommodation. As further discussed above, a jury could also find that Bednarska and Payne's request for better communication was a request for a reasonable accommodation. There is evidence that Equity did not provide such communication, in that it did not inform them that the elevator had returned to service until the day after it was repaired, which they learned from a neighbor rather than from Equity. *See* McGuinness Decl. Ex. F at PLTF000034 (email from Bednarska to Equity employee Tyler Rego).[15] Bednarska and Payne may also proceed on those theories.

Equity argues that meal reimbursement and rent credits are not "reasonable accommodations" within the meaning of the statutes at issue, and contends that these categories of monetary compensation for harm cause by the outage are instead recoverable, if at all, as damages. Def.'s Mot. at 14–15. Although neither party has cited a case directly considering that issue, Plaintiffs have not explained how such reimbursement or credit could be considered "'reasonable accommodations in rules, policies, practices, or services . . . necessary to afford [them] equal opportunity to use and enjoy a dwelling." *See Giebeler*, 343 F.3d at 1145. Unlike providing a hotel room, which served as a direct substitute for the dwelling that Equity normally provided to Bednarska and Payne, the meal reimbursement and rent credits are not equivalent to any service that non-disabled tenants received, or anything that Bednarska and Payne would normally receive from Equity but could not access while the elevator was out of service. The Court agrees with Equity that such reimbursement might be compensable through damages, but was not a reasonable accommodation.

---

[15] This email is hearsay, but Equity raised no objection and the Court presumes that Bednarska would be prepared to testify to the same facts stated therein. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003) (holding that a party need not present evidence in an admissible form on summary judgment so long as the party could do so at trial).

### E. Heavy Door Claims (FEHA and CDPA)

The Court previously declined to dismiss Bednarska and Moore's claims under FEHA and the CDPA based on a theory that doors (other than elevator doors) at Acton Courtyard were excessively heavy. Dec. 2017 Order at 13. Equity now asserts that Plaintiffs' expert Gary Waters measured the force required to open the doors and found that it complies with applicable rules. Def.'s Mot. at 19 (citing Winn Decl. Ex. A). The exhibit Equity cites is merely a cover letter for Plaintiffs' experts' reports and does not include the actual report on which Equity replies, *see* Winn Decl. Ex. A, but Plaintiffs acknowledge that the doors were compliant with that standard at the time of measurement, Pls.' Opp'n at 11. Plaintiffs nevertheless argue that their own interrogatory responses that they encountered "excessively heavy doors" are sufficient to create a genuine issue of fact as to whether the doors required more force to open when Plaintiffs encountered them than at the time of measurement. *Id.* at 12. As a starting point, a party's own interrogatory response is inadmissible hearsay. *AT & T Corp. v. Dataway Inc.*, 577 F. Supp. 2d 1099, 1109 (N.D. Cal. 2008). Setting that issue aside on the assumption that Plaintiffs could offer testimony consistent with their interrogatory responses, Plaintiffs admit that they did not themselves measure the force required to open the door, and offer no evidence either that they could tell from the force required that it exceeded the applicable standard, or that they tried opening the doors at the time they were measured and found them to require less force than when they previously encountered them.

The Court does not hold that subjective testimony alone regarding force required to open doors or similar barriers to access can never survive summary judgment. *See Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013) ("It's commonly understood that lay witnesses may estimate size, weight, distance, speed and time even when those quantities could be measured precisely."). In this case, however, where precise measurements *were* taken by both parties, their results are undisputed, and there is no evidence that the force required to open the door changed between the time when Plaintiffs encountered the doors and the time they were measured, no reasonable jury could conclude that the force required exceeded the force measured and thus also exceeded the applicable standards. Equity's motion is GRANTED as to claims for excessively

heavy doors.

Plaintiffs also argue that their claims should proceed because both parties' experts determined that certain doors swung more quickly than allowed by applicable rules. Equity objects to this theory as not disclosed in Plaintiffs' complaint. The allegations of the Second Amended Complaint pertaining to door accessibility read as follows:

> 13. THE PROPERTY's public use areas are not accessible and useable by disabled/handicapped persons because, among other reasons, the public access door and the courtyard access doors each have a threshold that exceeds ¼ inch unbeveled, the door requires excessive opening force and the courtyard door is too narrow to allow a wheelchair user to access the courtyard. On the courtyard, there are numerous unsafe conditions for disabled persons including unsafe changes in level which exceed ½ inch.

> 14. Plaintiffs Bednarska, Estes and Hara each have encountered the excessively heavy doors. None of them can open the doors without assistance. Trying to do it alone causes each of them difficulty and/or pain. They each are deterred from using it for those reasons.

SAC ¶¶ 13–14.

Nothing in Plaintiffs' complaint put Equity on notice that Plaintiffs believed the doors closed too quickly. The Ninth Circuit has addressed this precise issue, holding that "for purposes of Rule 8, a plaintiff must identify the barriers that constitute the grounds for a claim of discrimination under the ADA in the complaint itself; a defendant is not deemed to have fair notice of barriers identified elsewhere." *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 909 (9th Cir. 2011). The Court disregards Plaintiffs' arguments regarding the speed at which the doors closed.

### F. Berkeley Municipal Code

Both parties seek summary judgment on Plaintiffs' claims under the following sections of the Berkeley Municipal Code:

> 19.50.040 Duty of building operators to maintain and repair elevator and to provide alternative housing.

> A. Duty to conduct regular maintenance: building operators shall establish a program of regular elevator maintenance to ensure that elevators in their buildings remain usable and accessible at all times and that any repairs and servicing needed are completed within the shortest practicable time, in no event to exceed twenty-four hours, except as provided in Section 19.50.040C. Building operators shall require any elevator service company to give the building operator immediate notice of any repairs which will render the elevator

inoperable for more than four hours.

B. Duty to repair malfunctions expeditiously: Where an elevator malfunctions, the elevator shall be repaired at the earliest practicable time, not to exceed twenty-four hours of notice to the building operator of such malfunction, except as provided in Section 19.50.040C.

C. Delay beyond building operator's control--Duty to provide alternative housing pending elevator repair: If the building operator is unable to complete a repair of an elevator malfunction within twenty-four hours of notice of its malfunction, due to circumstances beyond his or her control, such building operator shall locate and provide alternative housing for any person residing in the building who needs to use the elevator to gain access to or egress from his or her unit because of such person's [disability]. Such alternative housing shall be decent, safe, sanitary and provided at the building operator's expense, however, the cost to the building operator for providing such alternative housing shall not exceed one hundred eighty dollars per day or a total cost of one thousand eight hundred dollars.

. . . The building operator's inability to timely repair shall be considered beyond the building operator's control only if the building operator had previously made reasonable arrangements, judged by relevant industry standards, to provide for expeditious repair of the elevator in the event of a malfunction, had regularly maintained the elevator and had taken all other reasonable steps to repair the elevator at the earliest practicable time. The duty to provide alternative housing shall not arise if the building operator is prevented from repairing the elevator within twenty-four hours or any time thereafter due to a natural disaster or an act of God, provided that the building operator shall be relieved of this duty only during the period that the inability to repair is caused by the natural disaster or act of God.

. . .

Berkeley Municipal Code § 19.50.040 (paragraph break added for ease of reading).

19.50.060 Failure to timely repair--Civil remedies.

A. Where the failure to timely repair an elevator or to provide alternative housing, as required by Section 19.50.040 of this chapter results in any person residing in the building having substantially restricted access to or egress from his or her unit because of such person's impaired ability to climb stairs as a result of such person's physical disability, medical condition, infirmity, illness or other similar circumstance, the person whose access to or egress from such building has been substantially restricted as set forth in this subsection may bring a civil action for:

1. Injunctive relief against the building operators of the building in which the elevator is inoperable to compel the building owner to repair the elevator and/or to provide alternative housing;

2. Actual damages including emotional distress;

3.  Statutory damages of two hundred dollars per day for each day that the elevator remains out of service in violation of Section 19.50.040 of this chapter. The total amount of such statutory damages shall not exceed ten thousand dollars per person for any one occasion that an elevator malfunctions;

4.  Reasonable attorney's fees and costs of suit.

. . .

*Id.* § 19.50.060.

The parties' dispute turns on whether Equity was *unable* to repair the elevator within twenty-four hours under section 19.50.040(B) and (C), and whether section 19.50.060 authorizes a civil action where a building operator failed to repair the elevator within twenty-four hours but provided alternative housing.

Starting with the latter argument, section 19.50.060 explicitly incorporates the standard of section 19.50.040 to define a building operator's duty to repair an elevator or provide alternative housing. Although a condition of "failure to timely repair an elevator or to provide alternative housing," standing alone, would only be satisfied where a defendant failed to *either* to repair *or* to provide alternative housing, the following clause of section 19.50.060(A)—"as required by Section 19.50.040"—directs the reader to that statute to understand the requirement at issue. Under section 19.50.040(B) and (C), the building operator has an absolute duty to repair within twenty-four hours, unless such repair is beyond the operator's control, in which case (and only then) the building operator has a duty to provide alternative housing. Accordingly, if a timely repair was within the building operator's control but not timely completed, the building operator has "fail[ed] to timely repair an elevator or to provide alternative housing, *as required by Section 19.50.040*," even if the building operator provides alternative housing. The Court rejects Equity's argument that providing alternative housing immunizes a building operator from a claim under this statute if the operator could have repaired the elevator within twenty-four hours but failed to do so, and DENIES Equity's motion for summary judgment on this claim, which rests solely on that argument. *See* Def.'s Mot. at 20–21.

Turning to whether Equity could have repaired the building within twenty-four hours, section 19.50.040(C) defines inability to do so as occurring if and only if three conditions are met:

31

"the building operator [1] had previously made reasonable arrangements, judged by relevant industry standards, to provide for expeditious repair of the elevator in the event of a malfunction, [2] had regularly maintained the elevator and [3] had taken all other reasonable steps to repair the elevator at the earliest practicable time." Berkeley Municipal Code § 19.50.040(C). The statute does not specify *which* industry's standards apply to judge reasonableness, and the parties did not address that issue in their briefs.

Plaintiffs argue that Equity cannot meet that standard because it did not "regularly maintain[] the elevator" and, by not ordering a replacement circuit board, did not "take[] all other reasonable steps to repair the elevator at the earliest practicable time." Pls.' Mot. at 13. Both questions present issues of fact for the jury.

Section 19.50.040(C) calls for determining reasonableness based on "relevant industry standards," but does not clarify which industry's standards should apply. Berkeley Municipal Code § 19.50.040(C). Plaintiffs' expert Joseph Stabler states that "returning the elevator to service was unnecessarily delayed by" at least thirteen days as a result of the decision to repair rather than replace the circuit board, and offers an undisputed declaration that replacement circuit boards were available for overnight shipping in 2015. Stabler Decl. ¶¶ 27–28, 31. Equity's own expert Steve Green testified at his deposition that he would have counseled Equity to order a replacement circuit board for overnight shipping rather than attempt to repair the circuit board:

> Q. I am going to put you in your consultant role again, and I am going to say if you had been presented with this problem and you were told the board was bad, would you have advised the owners to replace the board or try to fix it?
>
> A. Replace it.
>
> Q. And by replacing it you would basically get it back up in about an hour?
>
> A. No, you would still have to get the board. I would not expect the board to be stocked as a routinely used door operator part. Unitek on their website has a list of the commonly used parts for this door operator board, those I would expect to be locally stocked. The board is not something that is expected to go out, and so when you lose a board like this I would expect it not to be in stock. So you would have to call Unitek, purchase the board and have it overnighted.
>
> Q. . . . How long does it take you from the time of the decision to

32

replace the board until the board is back in the elevator and the elevator is up?

A. A day or two.

Q. Is there any scenario under which that takes five days?

A. No.

Derby Decl. Ex. H (Greene Dep.) at 41:13–42:21. Greene went on to testify that he would not support a decision to repair rather than replace the board even if it would save the building owner significant amounts of money. *Id.* at 44:10–17.

Greene states in his declaration that "Equity took reasonable steps (including paying for next-day shipping) to return the elevator to service as quickly as possible." Greene Decl. ¶ 10. The Municipal Code, however, does not merely require some reasonable steps; it requires an operator to take "all other reasonable steps," and Greene's declaration stops conspicuously short of saying that Equity did so. *See* Berkeley Municipal Code § 19.50.040(C). In light of both experts' opinions that an elevator operator faced with a defective circuit board should replace rather than repair the board, Plaintiffs would likely be entitled to judgment on this claim if the "industry standards" incorporated by the Berkeley Municipal Code were the standards of the elevator repair industry.

Although the statute provides little guidance as to its meaning, the Court concludes that the relevant industry is not the elevator repair industry, but instead the residential building management industry. The sections of the Municipal Code at issue relate to the duties of building operators. With no clear indication to the contrary, the Court holds as a matter of law that industry standards to be applied are the standards of the industry the statute regulates. Neither party has submitted evidence directly addressing how a reasonable building operator would respond to its elevator repair company informing the operator that the only elevator in a building with disabled tenants must remain out of service for an extended period of time. A jury might find that Equity acted reasonably in relying on ThyssenKrupp's expertise. Conversely, a jury might find that the drastic impact of the outage on Equity's disabled tenants should have prompted Equity to seek a second opinion as to whether there was any other option to return the elevator to service. Equity's ability to determine for itself after the outage that the part was in fact available might also suggest

33

that Equity acted unreasonably in failing to conduct such an investigation at any point during the two weeks that the elevator was out of service. Both parties' motions as to this claim are DENIED.

## IV.     CONCLUSION

For the reasons discussed above, Equity's motion is GRANTED as to Plaintiffs' claims under the Rehabilitation Act and the Unruh Act, as well as Plaintiffs' claims based on inaccessible doors other than the elevator. Plaintiffs' motion is DENIED. The remaining claims may proceed to trial as narrowed above.

**IT IS SO ORDERED.**

Dated: November 3, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge